UNITED STATES of America, Appellee,

v.

Barbaro Avilio HERNANDEZ, Appellant.

No. 92–2128.

United States Court of Appeals,
Eighth Circuit.

Submitted Oct. 13, 1992.
Decided Feb. 17, 1993.

---

Bruce H. Hanley, Minneapolis, MN, argued (Lisa D. Dejoras, Minneapolis, MN, on the brief), for appellant.

Richard G. Morgan, Asst. U.S. Attorney, Minneapolis, MN, argued, for appellee.

Before McMILLIAN, MAGILL, and HANSEN, Circuit Judges.

HANSEN, Circuit Judge.

A jury found Barbaro Avilio Hernandez guilty of two counts of drug trafficking. The district court[1] sentenced Hernandez to 63 months' imprisonment and a five-year term of supervised release. Hernandez appeals, alleging the evidence presented at trial was insufficient to sustain a conviction on either count. We affirm.

I. Background

In September 1991, Barbaro "Pipo" Hernandez and Frank Raymond flew from California to Minneapolis with one kilogram of cocaine. Upon arrival in Minnesota, Hernandez and Raymond went directly to the apartment of Bryan Thompson, a confidential informant for the Federal Bureau of Investigation (FBI). At the apartment, Raymond and Thompson discussed a drug sale while Hernandez watched television and browsed through magazines in another room. Thompson then contacted FBI Special Agent Michael Kelly to arrange for the sale of the cocaine, and Raymond, Thompson, and Hernandez drove to M & S Enterprises, the FBI undercover site where the sale was to take place. Raymond and Thompson approached the building with the cocaine while Hernandez remained in

---

1. The Honorable Donald D. Alsop, United States District Judge for the District of Minnesota.

the vehicle. Both Raymond and Hernandez were arrested shortly thereafter.

Defendant Hernandez was charged with two drug-trafficking charges: conspiracy to distribute approximately twenty kilograms of cocaine in violation of 21 U.S.C. § 841(a)(1) and 21 U.S.C. § 846, and aiding and abetting the distribution of one kilogram of cocaine in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. He was indicted with four other defendants, two of whom entered plea agreements. Hernandez was tried alone, and the jury convicted him on both counts.

## II. Standard of Review

■ Hernandez challenges his conviction on the grounds that there was insufficient evidence presented at trial to support a guilty verdict on either count. On appeal this court views the evidence in a light most favorable to the government, gives the government the benefit of all reasonable inferences, and must uphold the conviction if a reasonable jury could have found the defendant guilty beyond a reasonable doubt. *United States v. Bennett,* 956 F.2d 1476, 1478 (8th Cir.1992) (citing *United States v. Maejia,* 928 F.2d 810, 812 (8th Cir.1991)). The evidence need not "exclude every reasonable hypothesis except guilt" in order for this court to affirm a jury verdict. *United States v. Galvan,* 961 F.2d 738, 740 (8th Cir.1992) (citation omitted). Applying these standards, we turn to a review of Hernandez's convictions.

## III. Conspiracy to Distribute Cocaine

■ In order to establish that a defendant committed the offense of conspiracy to distribute a controlled substance, the government must show that the defendant entered an agreement with at least one other person with the objective to violate the law. *United States v. Brown,* 956 F.2d 782, 785 (8th Cir.1992). To be a conspirator, one "does not have to be aware of the existence of all other conspirators or all the details of the conspiracy." *United States v. Watts,* 950 F.2d 508, 512 (8th Cir.1991), *cert. denied,* — U.S. —, 112 S.Ct. 1276, 117 L.Ed.2d 502 (1992) (citation omitted).

Each conspirator need not even have been a part of the conspiracy from the start. *United States v. Burchinal,* 657 F.2d 985, 990 (8th Cir.), *cert. denied,* 454 U.S. 1086, 102 S.Ct. 646, 70 L.Ed.2d 622 (1981). Rather, "[a]n individual becomes a member of a conspiracy when he knowingly contributes his efforts to the conspiracy's objectives." *United States v. Duckworth,* 945 F.2d 1052, 1053 (8th Cir.1991) (citing *United States v. Bonadonna,* 775 F.2d 949, 957 (8th Cir.1985)).

Defendant asserts that his mere presence during several stages of the September 1991 transaction does not amount to involvement in the drug transaction such that he could be convicted of conspiracy. At most, he contends, the evidence shows that he knew some of the conspirators and that he went to Minneapolis with Frank Raymond in September 1991. Defendant asserts he knew nothing about the cocaine sale. Rather, he flew to Minneapolis with Raymond because he had never been to Minnesota before and because Raymond had invited him "to party."

■ Mere presence at the location of the crime alone, even when coupled with knowledge of that crime, is not sufficient to establish guilt on a conspiracy charge. *United States v. Soto,* 716 F.2d 989, 991 (2d Cir.1983). Yet only slight evidence connecting a defendant to the conspiracy may be enough to sustain a conviction. *Brown,* 956 F.2d at 785; *United States v. Ivey,* 915 F.2d 380, 384 (8th Cir.1990). In this case, the testimony presented at trial sufficiently linked Hernandez to the conspiracy to distribute cocaine and showed that he aided and abetted the delivery to the undercover officer.

Defendant's contention that he was merely an innocent bystander is refuted by the trial testimony describing conspiratorial activities that occurred both in California and en route to Minnesota. Ernesto Leon, who testified as having been in the drug business for four to five years, put up his 21–foot day-cruiser boat as collateral with an unknown Mexican drug supplier in order to finance the purchase of the one

kilogram of cocaine.[2] Leon stated that Hernandez arrived at his house with the supplier, who came into his office, dropped off the cocaine, and left and that Hernandez was present when Leon later handed the cocaine over to Raymond for transport to Minnesota. Leon also testified that he spoke briefly to Hernandez about the transaction that was to take place later in Minnesota. Specifically, he told Hernandez to "let Frank [Raymond] do his own thing [because] he knew the people out here" and wanted Hernandez "just to make sure that everything went all right." Trial transcript (Tr.) at 270, 271. Leon testified he was concerned that Raymond, who had a tendency to drink a great deal, might become drunk and ruin the deal. *Id.* Leon further stated: "Basically I just told him to keep an eye on the things" and not to "let it leave his sight until Frank was ready to go do it." *Id.* Leon's understanding was that Hernandez had the responsibility of paying the source back in California.[3]

Frank Raymond's trial testimony also implicated Hernandez in the conspiracy and indicated he was a knowing participant. Raymond testified Leon told him that Hernandez was going to accompany him to Minnesota for the drug transaction. Raymond testified that he bought two tickets at the airport, using fictitious names for both and paying with cash. Raymond did say that he had asked Hernandez to come to Minnesota "to party." Tr. at 372, 376. Yet Raymond also indicated that he and Hernandez discussed the upcoming drug transaction while on the airplane to Minnesota. Specifically, Raymond testified, "I

told him that I had it and I was going to drop off the kilo and then we would go party for awhile." Tr. at 379. Raymond also testified that when Thompson asked for more cocaine than the one kilogram Thompson had to sell, Hernandez was to take the money from the one kilogram transaction back to California for Raymond and to accompany Thompson to California as well in order to acquire more cocaine. Thompson's testimony corroborated Raymond's testimony that Hernandez was to transport the money back to California. Tr. at 333. So did Leon's. Tr. at 271. Thus, from the testimony a reasonable jury could have believed that Hernandez had a dual purpose for going to Minnesota: "to party" as well as to facilitate a sale of one kilogram of cocaine.

Defendant discredits much of the government's case by arguing that Leon was impeached at trial to the extent that his testimony could not have been believed by a reasonable jury. Specifically, Leon testified that he lied when, immediately upon his arrest, he told the FBI agents he had nothing to do with the September 1991 transaction. Leon explained, however, that telling the truth is not necessarily a wise strategy in the drug business. At the time of his arrest he still "didn't know what was going to happen." Tr. at 300. By the time of Hernandez's trial, however, he had already entered a guilty plea. Leon stated, in his own words, that he was "already in this as deep as I can get," tr. at 292, suggesting he no longer had much, if anything at all, to gain by lying to the court. The jury was presented with both versions

**2.** Defendant argues that it is unrealistic to believe that Leon would put up as collateral the ownership of his boat in order to finance a drug transaction initiated by Raymond. Yet Leon testified that not only was he to receive $2000 for his efforts, he also hoped that in the future his colleagues would be able to obtain their own supply of cocaine without his assistance. Furthermore, to state, as does defendant, that "[i]t is patently unbelievable Ernie Leon would simply give the pink slip to his boat to a man he did not even know," Appellant's brief at 13, ignores the fact that Raymond and Hernandez were the ones in which Leon had to place his trust to conduct the actual sale in Minnesota. Leon, having worked with Raymond before on a ship-

ment of cocaine to Thompson in Minnesota, did not enter this transaction naively.

**3.** Leon also testified about a drug transaction that took place in July 1991 involving Leon, Frank Raymond, and Pedro "Pete" Reales, which was conducted in a remarkably similar fashion to the September 1991 transaction. Leon contributed a significant portion of the purchase price for one kilogram of cocaine that Raymond was to deliver to Minnesota. Reales' role was "to make sure everything went all right and bring back the money." Tr. at 261. The government points out that Reales and Hernandez were to have similar responsibilities in their respective California–Minnesota transactions.

of Leon's involvement, and it was free to give his trial testimony the weight it considered appropriate.

■ Defendant also emphasizes the paucity of direct evidence presented at trial that indicated his involvement in the conspiracy. He asserts, in essence, that because little was said among the coconspirators concerning the details of the drug transaction and the depth of each individual's knowledge the government presented insufficient evidence to support a guilty verdict on either count. When arrested in Minnesota, the defendant had the telephone numbers for Leon's drug supplier, for Leon's drug trafficking partner (Reales), for Raymond, and for Thompson's Minnesota pager in his address book.

■ An agreement to commit an illegal act " 'need not be formal,' " and " 'a tacit understanding will suffice.' " *United States v. Wint*, 974 F.2d 961, 968 (8th Cir. 1992) (citation omitted). Indeed, the nature of a drug conspiracy often requires secrecy. *See Ivey*, 915 F.2d at 384; *see also United States v. Maejia*, 928 F.2d 810, 813 (8th Cir.1991) (Conspiracy may be proved entirely by circumstantial evidence, as "the nature of the offense of conspiracy with its necessary aspect of secrecy often requires that the agreement be implied from the surrounding circumstances.") (citation omitted). Leon testified that he did not discuss his general drug dealing with Hernandez; yet he also explained that this was the only transaction in which he had worked with Hernandez. Leon also stated that because Hernandez came to his house with the supplier he saw no need to inquire whether Hernandez understood the purpose of the trip to Minneapolis. Frank Raymond testified that he and Hernandez did not discuss the drug transaction in much detail simply because "you don't talk that much in this business," and "[y]ou don't let everybody know what you are doing exactly." Tr. at 380. He explained further: "That is just the law in the drug business.... It is weird in this business,

you know, it is not like the every ordinary day business, everyone is very secretive." Tr. at 380.

The jury heard evidence about the nature of the drug trade and the importance of discretion within it that explained why little testimony was presented regarding prior conversations explicitly detailing the September 1991 cocaine transaction. We find the evidence presented at trial, although not overwhelming, was sufficient to sustain Hernandez's conviction for conspiracy to distribute cocaine in violation of 21 U.S.C. § 841(a)(1) and 21 U.S.C. § 846. *See Ivey*, 915 F.2d at 384 (Evidence that was admittedly "not overwhelming" was nevertheless sufficient to sustain conviction.). We affirm.

## IV. Aiding and Abetting the Distribution of Cocaine

■ Defendant also challenges his conviction for aiding and abetting the distribution of cocaine. In order to prove Hernandez guilty of aiding and abetting the distribution of cocaine, the government must show that Hernandez associated himself with the distribution venture, participated in it "as something [he] wished to bring about," and acted in such a way as to ensure its success. *United States v. Posters 'N' Things Ltd.*, 969 F.2d 652, 661–62 (8th Cir.1992) (citing *United States v. McCrady*, 774 F.2d 868, 874 (8th Cir.1985)). In sum, Hernandez must have had a "purposeful attitude" defined as affirmative participation which at least encourages the perpetrator in order to be convicted on the aiding and abetting charge. *Ivey*, 915 F.2d at 384.

■ Defendant highlights the testimony indicating he did not actively participate in the attempted sale of cocaine in September 1991. "The cases in this circuit [however] have clearly held that neither possession nor an actual sale by a defendant need be proved by the government on a charge of distributing or aiding and abetting the distribution of drugs." *United States v.*

*Marin–Cifuentes,* 866 F.2d 988, 993 (8th Cir.1989). Furthermore, Hernandez's assertion focuses mainly on his activities upon arrival in Minnesota, largely ignoring the testimony that linked him to the preparations that took place earlier in California. Finally, the jury, in light of the rest of the evidence, simply did not find Hernandez's testimony that he went to Minnesota only "to party" to be fully credible.[4] *See Marin–Cifuentes,* 866 F.2d at 993 (When questions regarding credibility and demeanor of a witness are crucial factors in determining a defendant's intent in a drug case, those issues are to be resolved by the jury.).

We also find that the evidence supporting Hernandez's conviction for conspiracy to distribute cocaine supports the conviction for aiding and abetting the distribution of cocaine as well. *See Wint,* 974 F.2d at 968 n. 5; *United States v. Galvan,* 961 F.2d 738, 741 (8th Cir.1992). Accordingly, we affirm Hernandez's conviction for aiding and abetting the distribution of one kilogram of cocaine in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.

## V. Conclusion

Viewing the evidence in a light most favorable to the government, we find the evidence presented at trial was sufficient to support defendant Hernandez's convictions on two counts of drug trafficking. We affirm.

---

4. Leon, for example, stated at trial that "Raymond told me Hernandez knew [that the delivery of cocaine to Minneapolis was to occur on September 21, 1991]." Tr. at 290.