UNITED STATES of America, Appellee,

v.

Jerry AKERS, Appellant.

UNITED STATES of America, Appellee,

v.

Robby G. ROST, also known as Bobby G. Rost, Appellant.

Nos. 92–2792, 92–3051.

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 18, 1992.

Decided March 2, 1993.

M. Elise Branyan, Federal Public Defender, Springfield, MO, argued (Raymond C. Conrad, Jr., Federal Public Defender, MO, on brief), for Jerry Akers.

Roger C. Jones, Springfield, MO, argued, for Robby G. Rost.

David P. Rush, Asst. U.S. Atty., Springfield, MO, argued, for U.S.

Before JOHN R. GIBSON and WOLLMAN, Circuit Judges, and STROM,[*] District Judge.

WOLLMAN, Circuit Judge.

Jerry Akers and Robby Rost appeal from their respective convictions in district court[1] for conspiracy to distribute methamphetamine, attempt to possess methamphetamine with intent to distribute, and use of a communication facility to facilitate a drug trafficking offense. Appellant Rost also appeals from his additional convictions for assault on a federal officer and use of a firearm in connection with a drug-related offense. We affirm.

I.

On February 12, 1992, Robert Ross received a package from the U.S. Postal Service addressed to "Bob Rost, 5330 North H Highway." Although Ross was surprised that the package had been delivered to him because it listed a different name and address, he opened the package nevertheless. After removing a covering of paper towels, aluminum foil, and tape, Ross discovered that it contained a white powder that smelled, as he later testified, like "washing powder." His suspicions raised, Ross telephoned the Greene County, Missouri Sheriff's Department, officers from which came to his house and took custody of the package. Later that same day, Ross received calls from a man who identified himself as Bob Rost and a woman, both inquiring about the package. Ross informed both callers that he had not opened the package and had returned it to the Post Office.

After ascertaining that the package probably contained methamphetamine, the Greene County Sheriff's Department contacted the federal Drug Enforcement Administration's (DEA) Springfield, Missouri office. The DEA and the Sheriff's Department formulated a plan to attempt delivery of the package to the original addressee at the main Springfield, Missouri post office. Accordingly, law enforcement officials repackaged a portion of the methamphetamine and presented it to postal officers after consulting with them regarding the plan. Postal supervisor C.L. Carter then telephoned a number that he had received from a previous call inquiring about the package. Carter informed the caller that the package had been returned to the post office and that the caller could come to the post office to pick it up himself or have it delivered the following morning. The caller told Carter that he would come to the post office to collect the package. The authorities set up surveillance in the post office parking lot and designated Special Agent John Cornille to deliver the package inside the post office.

Shortly thereafter, Agent Cornille received a radio call from the surveillance team informing him that three individuals had entered the parking lot in two vehicles, a Chevrolet Corvette and a Pontiac Firebird, and were about to enter the post office. Moments later, the three individuals, later identified as Jerry Akers, Robby Rost, and Donald Osburn, entered the post office. Osburn asked if there was an Overnight Express package for him. Agent

---

[*] The HONORABLE LYLE S. STROM, Chief Judge, United States District Court for the District of Nebraska, sitting by designation.

1. The Honorable Russell G. Clark, Senior United States District Judge for the Western District of Missouri.

Cornille asked him, "Are you Bob Rost?" Osburn replied "Yes." When Agent Cornille asked him to sign for the package, however, Osburn did not step forward. Rost did, and signed "Bob Rost" on the receipt, whereupon Cornille handed Rost the package containing the methamphetamine. The three individuals then exited the building.

Upon exiting the post office and moving towards their vehicles, Akers, Rost, and Osburn were met by the surveillance detail, who identified themselves to the three men and requested them to stop. Thereupon, all three men attempted to flee. Rost and Osburn leaped into Rost's Corvette, and Rost tossed the package to Akers. Akers caught the package and ran a few steps with it before discarding it and attempting to escape. Officers apprehended Akers at the scene.

In response to questioning immediately after his arrest, Akers claimed that he did not know who the occupants of the Corvette were or where they were going. Akers contended that he had only just met them when they had asked him to direct them to the post office. An inventory of Akers' vehicle, the Firebird, conducted at the scene, recovered the following items: (1) a receipt for the sale of the Firebird made out to "Bob Rost"; (2) an inspection sticker and application for Missouri title in the name of "Bobby G. Rost"; (3) photographs of Rost; (4) Federal Express envelopes; and (5) syringes.

Meanwhile, Rost and Osburn attempted to flee the scene in the Corvette. Agent Cornille, who had just exited the building, ordered them to stop. Instead of leaving the parking lot by the nearest exit, Rost attempted to run over Cornille. Cornille gave chase in his car, successfully apprehending Rost and Osburn a few blocks away. An inventory of Rost's wallet revealed the following items: (1) $4,500 in cash; (2) a red notebook containing police radio frequencies and a listing of first names and numbers, some with the word "bad" scrawled above them; (3) a piece of paper with the words "P2P" on it, containing weight measurements, chemical de-

scriptions, and glassware descriptions consistent with methamphetamine production; and (4) a pawn shop receipt listing a gun and its serial number.

Shortly after his arrest, Osburn told officers that he would like to talk with them and implicated himself, Rost, and Akers without any agreement concerning what would happen to him. Officers obtained a search warrant for Rost's residence on the basis of Osburn's information.

The officers' search of Rost's residence uncovered the following items: (1) zip-lock baggies with the corners cut off, of the sort frequently used by methamphetamine dealers; (2) a set of triple-beam scales, of the sort often retained for weighing drug quantities; (3) an empty bottle of Inositol, a common cutting agent for methamphetamine; (4) a gun with the same serial number as the one on the pawn shop receipt found in Rost's wallet; (5) a corner packet of methamphetamine; and (6) a letter signed by "Richard" and addressed to "Bob and Nancy."

Osburn, who is Rost's half-brother, pleaded guilty to a charge of conspiracy to distribute methamphetamine and agreed to testify for the government. At trial, Osburn testified that Rost was heavily into trafficking methamphetamine and that his primary source was a Richard Blankenship from Texas. Osburn testified that Rost would drive to Texas to obtain the methamphetamine, monitoring police channels along the way. Osburn stated that he had assisted Rost in drug trafficking, mostly in collecting money and delivering the occasional package.

Osburn testified that he and Rost first met Akers in August 1991 to purchase methamphetamine from him. Rost gave Akers money, but did not receive any methamphetamine. Osburn testified that Akers then began to work for Rost as a distributor because he was liable for the loss. Although Rost had been receiving methamphetamine from Blankenship, Blankenship would shut down his operations periodically. Akers provided a new methamphetamine source in California, a woman who was a sister to one of Akers' girlfriends.

Akers and Rost would mail money to this woman via Federal Express and she would mail a package of methamphetamine back to them. Osburn testified that Akers and Rost had received six or seven packages from their Californian contact, each package containing between a quarter and a half-pound of methamphetamine.

Osburn also testified that Akers had sold primarily out of motel rooms. Osburn testified that on one such occasion he and Rost were selling methamphetamine from Room 18 of the Satellite Motel and Akers was selling from Room 22, when Akers was contacted by police. This portion of Osburn's testimony was corroborated by Officer Gregory Fels of the Springfield Police Department. On that occasion, Officer Fels obtained Akers's permission to search Room 22 and ultimately recovered the following items: (1) a zip-lock bag with a box of rolled plastic bags; (2) a Pepsi can with the top cut off containing Inositol; (3) a small scale with white powder residue; and (4) five spoons with a powdery white residue. Officer Fels also observed a motorcycle belonging to Rost in Akers's room. Subsequent testing of the spoons and scale by a Springfield Police serologist revealed that the residue contained methamphetamine.

The jury convicted Rost on all five counts and Akers on all three counts. The district court sentenced Rost to a total term of 180 months' imprisonment, to be followed by eight years of supervised release. The district court sentenced Akers to total term of 97 months' imprisonment, to be followed by a four years of supervised release.

## II.

### A. *Jerry Akers*

On appeal, Akers argues that the district court erred by (1) denying his motion for acquittal based upon the insufficiency of the evidence; (2) denying his motion for severance; (3) refusing to grant his motion in limine to exclude certain evidence; and (4) refusing to give his tendered "mere presence" Instructions A and B. We address these issues in turn.

In reviewing a district court's decision to deny a motion for a judgment of acquittal based on the insufficiency of the evidence to support a guilty verdict, " 'we examine the evidence in the light most favorable to the government, giving it the benefit of all reasonable inferences. We reverse only if we conclude that a reasonable fact-finder must have entertained a reasonable doubt about the government's proof of one of the offense's essential elements.' " *United States v. Wint*, 974 F.2d 961, 968 (8th Cir. 1992), *cert. denied*, — U.S. —, 113 S.Ct. 1001, 122 L.Ed.2d 151 (1993) (quoting *United States v. Ivey*, 915 F.2d 380, 383 (8th Cir.1990)).

■ We find that sufficient evidence supported the jury's verdict that Akers was guilty of conspiracy to distribute methamphetamine. "To convict a defendant of conspiracy, the government must prove beyond a reasonable doubt that there was an agreement to achieve some illegal purpose, that the defendant knew of the agreement, and that the defendant knowingly became a part of the conspiracy." *Ivey*, 915 F.2d at 383–84. As we noted in *Ivey*, "[o]nce a conspiracy is established, even slight evidence connecting a defendant to the conspiracy may be sufficient to prove the defendant's involvement." *Id.* at 384.

Osburn testified concerning Akers' substantial involvement in the conspiracy. Osburn pinpointed the origination of the Akers–Rost relationship from August 1991, when Akers failed to deliver methamphetamine for which Rost had paid Akers, thereby becoming indebted to Rost. Thereafter, Akers provided a methamphetamine source in California for Rost, Osburn, and himself. Osburn testified that Rost and Akers obtained between six and seven shipments from this California source. The name "Jerry" was also listed in Rost's account book for his drug dealings. Moreover, Osburn's testimony was independently corroborated by law enforcement officials. Officer Fels testified about his encounter with Akers on January 2, 1992 at the Satellite Motel, where he had observed Rost's motorcycle in Akers' room and uncovered various drug paraphernalia in his

search of the room. In addition, Akers' actions on the night of the post office incident corroborate his connection with Rost. Specifically, Rost tossed Akers the package, Akers attempted to elude officers, and pictures of Rost were found in Akers' car. Accordingly, the district court did not err in denying Akers' motion for acquittal on the conspiracy count.

■ Likewise, there is sufficient evidence to support the jury's verdict that Akers was guilty of attempt to possess with the intent to distribute methamphetamine and of using a communication facility to facilitate knowing possession with the intent to distribute methamphetamine. The evidence adduced at trial showed that on the night he went to the post office, Akers (1) accompanied Rost and Osburn inside; (2) caught the package tossed to him by Rost; (3) attempted to elude law enforcement officials; (4) stated after his arrest that he did not know Rost and Osburn and was merely showing them the way to the post office; and (5) had photographs of Rost in his car. Given this evidence, we cannot say that the district court erred in refusing to grant Akers's motion for a judgment of acquittal on these two counts.

Akers next argues that the district court erred in refusing to grant his motion for severance on the grounds that the jury was unable to compartmentalize the evidence.

■ Federal Rule of Criminal Procedure 8(b) provides for joinder of defendants when "they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses." Severance is appropriate where joinder would cause prejudice to the rights of a defendant under Fed.R.Crim.P. 14.

We will not reverse a district court's denial of a motion for severance "absent an abuse of discretion resulting in clear prejudice." *United States v. Johnson*, 944 F.2d 396, 402 (8th Cir.), *cert. denied,* — U.S. ——, 112 S.Ct. 646, 116 L.Ed.2d 663 (1991) and — U.S. ——, 112 S.Ct. 983, 117 L.Ed.2d 146 (1992) and — U.S. ——, 112 S.Ct. 2951, 119 L.Ed.2d 574 (1992). We decide this question based on our assessment of "whether the trial jury could compartmentalize the evidence against each defendant." *United States v. Nevils*, 897 F.2d 300, 305 (8th Cir.), *cert. denied,* 498 U.S. 844, 111 S.Ct. 125, 112 L.Ed.2d 93 (1990). We also note, with particular relevance to this case, that "[p]ersons charged with a conspiracy will generally be tried together, especially where proof of the charges against each of the defendants is based on the same evidence and acts." *United States v. O'Meara*, 895 F.2d 1216, 1218 (8th Cir.), *cert. denied,* 498 U.S. 943, 111 S.Ct. 352, 112 L.Ed.2d 316 (1990).

■ The indictment charged Akers, along with his co-defendant Rost, with conspiracy to distribute methamphetamine, attempting to possess with the intent to distribute methamphetamine, and using a communication facility to facilitate knowing possession with the intent to distribute methamphetamine. All of the charged offenses occurred during the course of, and in furtherance of, the conspiracy. Considerable evidence linked Akers to the conspiracy. Osburn testified that Akers had provided a source of methamphetamine from California and had served as a distributor for Ross. Additional testimony, corroborated by law enforcement officials, showed that the two defendants dealt drugs out of the same motel. In addition, testimony concerning the attempted recovery of the package at the Springfield, Missouri post office was applicable to both Akers and Rost.

Moreover, the government made clear during the testimony concerning Rost's actions in driving the Corvette that Akers was not involved. Likewise, testimony concerning Rost's use of a firearm in relation to a drug trafficking offense did not implicate Akers. Moreover, the court specifically instructed the jury to treat each defendant separately. Given the reasons for trying the defendants together, the efforts of the trial court to ensure separate treatment of each defendant, and the lack of any showing on Akers's part that the jury was unable to compartmentalize the evidence against him, we find no error here.

Third, Akers contends that the district court erred in refusing to grant his motion in limine to exclude various evidence pertaining to his co-defendant Rost. Akers attempted to exclude the following evidence: (1) items seized from Rost's residence, including the gun and drug paraphernalia, and (2) items seized from Rost's person following his arrest, including recipes for preparing methamphetamine and $4,500 in cash. Akers essentially contends that the government, in introducing this evidence of bad acts by Rost, was also attempting by innuendo to impute guilt for these same acts to Akers. The introduction of this evidence, Akers argues, made it easier for the government to convict him on the three charges, even though this evidence did not pertain to those charges.

We find no merit in this contention. First, most of the evidence addressed in Akers's motion in limine supported the government's conspiracy charge, which was directed to both defendants. Second, most of the evidence that did not pertain to Akers did pertain to Rost's guilt and therefore was relevant and properly admitted. Last, to the extent that Akers argues that the government, in introducing the evidence, was attempting to create "guilt by association," this argument is merely a rehash of Akers' second argument, which we have already rejected as being without merit.

Last, Akers argues that the district court erred in refusing his Proposed Instructions No. A and B.

We have held that, generally, a defendant is entitled to have an instruction given to the jury if it (1) is timely submitted; (2) correctly states the law; and (3) is supported by the evidence. *See, e.g., United States v. Jerde*, 841 F.2d 818, 823 (8th Cir.1988). Of course, a defendant has no such entitlement where he fails to meet one of these three requirements. Moreover, we have qualified this statement, noting that the defendant is "not entitled to a particularly worded instruction where the instructions given by the trial judge adequately and correctly cover the substance of the requested instruction." *United States v. Manning*, 618 F.2d 45, 48 (8th Cir.1980). "[T]he district court is given broad discretion in framing the language of an instruction." *United States v. Ribaste*, 905 F.2d 1140, 1143 (8th Cir.1990).

Akers requested a "mere presence" instruction, which states, essentially, that a defendant's mere presence at the scene of a crime, without more, does not prove that the defendant is a co-conspirator with those parties who have in fact committed the crime. The evidence, however, does not support Akers' view of the facts. The evidence adduced at trial demonstrated that Akers was a major participant in the conspiracy. Akers' claim that he was merely present at the post office debacle borders on the fanciful. He accompanied Rost and Osburn inside; caught the package tossed to him by Rost; attempted to elude law enforcement officials; and stated after his arrest that he didn't know Rost and Osburn and was merely showing them the way to the post office, when, in fact, he had photographs of Rost in his car. Moreover, the district court gave an instruction that covered the substance of Akers' requested Instructions A and B. Accordingly, we reject Akers's argument.

We have considered Akers' remaining arguments and we find them to be without merit.

## B. *Robby Rost*

Rost raises a single claim on appeal: that the district court erred in failing to grant his motion for acquittal based upon the insufficiency of the evidence. The essence of Rost's argument is that the district court erred in overruling Rost's motion for acquittal based upon the insufficiency of the evidence because Osburn later recanted his testimony during Rost's sentencing hearing.[2]

Because Osburn had not yet recanted at the time the district court ruled on Rost's motion for judgment of acquittal, Rost's

---

2. Osburn admitted at the time of his recantation that he had received letters from Rost and

Rost's girlfriend asking him to recant his testimony.

argument properly supports only a motion for a new trial. This argument is not properly before us, however, because Rost has not made such a motion in the district court. Indeed, counsel for Rost candidly admitted at oral argument that he had decided not to make the motion for a new trial because the district court remarked at sentencing that it would not accord Osburn's subsequent recantation any weight because the jury had accepted his testimony at trial.[3]

The judgment of the district court is affirmed.

---

**3.** We intimate no view on whether Rost has any grounds for relief under 28 U.S.C. § 2255.